IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JOHN O. MILLER, | Cause No. CV 23-75-H-DWM |
| Plaintiff, | |
| vs. | ORDER |
| MELISSA WOOFTER, ET AL., | |
| Defendants. | |

Pending before the Court is Defendant Melissa Woofter's motion for summary judgment on Plaintiff John O. Miller's Second Amended Complaint. (Doc. 71.) The motion for summary judgment is granted.

## I.  GENERAL BACKGROUND[1]

Plaintiff Miller is an inmate at Montana State Prison. Miller participated in a therapy group led by Defendant Woofter between March 19, 2022 and April 16, 2022. Miller's group consisted of Miller and three other inmates, two of whom were purportedly members of the LGBTQ+ community. Prior to joining this group, Miller and Woofter had discussed Miller's Christian beliefs. On April 15, 2022, Miller filed a grievance regarding the group. On April 16, 2022, Miller was removed from a session of the group. Later, Miller and Woofter discussed his

---

[1] This brief recitation of the facts will be supplemented and elaborated as needed below. The facts stated in this section are not disputed.

1

discomfort with LGBTQ+ topics being discussed in the group. Miller was subsequently permanently removed from the group. The crux of the dispute between the parties is whether Miller's permanent removal violated his constitutional rights. Miller also alleges that Woofter's case notes in his file, which in turn were available to the parole board, were false and retaliatory. (Doc. 13 at 5. (Miller calls these notes "reports".))

Miller filed suit. The operative Second Amended Complaint asserts four claims against Woofter: First Amendment retaliation against him for his religious speech (Count 1) and violation of his freedom of religion (Count 2); Fourteenth Amendment discrimination against him as a member of a protected class (Count 3); and violation of Mont. Code Ann. § 27-33-105 (Count 4). (Doc. 13).

## II. MOTION FOR SUMMARY JUDGMENT

Defendant Melissa Woofter claims she is entitled to summary judgment for six reasons. (Doc. 72.) First, Miller failed to exhaust his administrative remedies. Second, Miller cannot establish that Woofter retaliated against him for protected conduct. Third, Miller cannot establish that Woofter violated his right to religious freedom. Fourth, Miller cannot establish that his Fourteenth Amendment equal protection rights were violated. Fifth, Woofter did not violate Mont. Code Ann. § 27-33-105. Sixth, Woofter is entitled to qualified immunity. (Doc. 72 at 4.) Woofter's brief is accompanied by a Statement of Undisputed Facts. (Doc. 73.)

Miller responded to the motion and filed a Statement of Disputed Facts. (Docs. 77 and 78.) Woofter filed a reply. (Doc. 79.)

## A.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id*. If the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

The Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor when deciding a motion for summary judgment. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007). However, "if the factual context makes the non-moving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (emphasis in original)).

**B.  Analysis**

1. Administrative Remedies

Woofter asserts that the merits of Miller's suit need not be reached, because he failed to exhaust administrative remedies related to his claim. (Doc. 72 at 10.) Woofter contends that Miller filed six grievances related to his mental health treatment, but none complained about his removal from the group, the event that is the basis of all of Miller's claims. (Doc. 72 at 11, citing SUF ¶¶ 18, 20, 22, 24, 25, 27).)

Miller responds that he did exhaust. He filed Grievance 19099, in which he

4

states that he was expelled from the group. (Doc. 77 at 3 (citing Ex. 10 and 11).)

He also refers to being expelled from the group in Grievance 19351. (Doc. 77 at 4.)

He sought an investigation of Woofter as his remedy. As a result, he contends that

he properly exhausted.

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement

states:

> [n]o action shall be brought with respect to prison conditions under section
> 1983 of this title, or any other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such administrative remedies as are
> available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002);

*Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must "complete the

administrative review process in accordance with the applicable procedural rules,

including deadlines, as a precondition to bringing suit in federal court." *Woodford*

*v. Ngo*, 548 U.S. 81, 93-97 (2006).

Defendants bear the burden of proving failure to exhaust. *See Brown v.*

*Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1)

an available administrative remedy existed and (2) the prisoner failed to exhaust

that remedy, then the burden of production shifts to the plaintiff to bring forth

evidence "showing that there is something in his particular case that made the

existing and generally available administrative remedies effectively unavailable to

him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).

5

Under the PLRA, prison regulations define the exhaustion requirements. *Jones*, 549 U.S. at 218. Montana State Prison has a grievance procedure, found in MSP Operation Procedure 3.3.3. Woofter's Statement of Undisputed Facts includes two grievances in which Miller characterizes his expulsion from the group as "malicious" and "wrong." (Doc. 77-1 at 14 and 18.) The main thrust of his grievances was his ongoing desire to receive mental health treatment, not the expulsion itself, and his desire to have certain of Woofter's notes about him deleted. He did not ask to be reinstated in Woofter's group, or have his expulsion granted, and thus, he likely did not technically exhaust his grievances as to that issue. However, his characterization of his removal from the group was probably sufficient to give staff notice that he was not happy about how that happened. Miller's grievances will not be judged on their rhetorical structure, and summary judgment will not be granted on the basis of failure to exhaust.

2. Retaliation

Woofter asserts that Miller cannot establish that she retaliated against him for his protected speech. (Doc. 72 at 11.) Woofter's first point is that Miller's speech is not protected, because he does not have a right to therapy without LGBTQ+ individuals. (Doc. 72 at 12.) Woofter characterizes Miller's religious argument as a "shield to disparage other individuals," and not as proper religious speech. *Id.* Woofter further argues that Miller's removal from the group was not

6

retaliation against him, nor was drafting treatment notes that were critical of him. (Doc. 72 at 13–18.)

Miller does not directly respond to the contention that his speech was not, in fact, protected religious speech. Miller responds that Woofter's alleged hostility toward him only arose after he "openly disagreed" with her on religious matters. (Doc. 77 at 5.) He submits the declarations of two other members of the group to contradict her statements regarding his conduct in the group. (Doc. 77-1 at 1–6.)

A preliminary note on the content of the parties' statements of fact is warranted. (Docs. 73 and 78.) The main "factual" disputes turn out to be perspectives on human interactions. That is, both sides deal in subjective assessments of whose turn it is to speak, and what is polite or rude or interrupting or disruptive or degrading. These are inherently subjective assessments, and thus, this order avoids relying on them. One person's rude is another person's polite, and thus, these are not facts subject to proof, though they are, of course, assessments that a jury could make at trial. The only facts that can be ascertained from the record aside from the conflicting subjective observations found in the parties' affidavits are the content of documents attached by the parties. Miller disputes even the content of these, denying Woofter's assertion that she checked in with him weekly. (Doc. 78

7

at 3.) Miller asserts that Woofter lied in her contemporaneous progress notes, attached to her S.U.F. at Doc. 73-3. This Order reaches its conclusion without deciding exactly how rude Miller was or was not in group therapy.

A prisoner's First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987). "A prison inmate retains those first amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)).

Within the prison context, a viable claim of First Amendment retaliation includes five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (recognizing retaliation when prison officials confiscated a prisoner's property, plotted to transfer him, and physically assaulted him because of repeated filings of grievances against them).

a. Did Woofter take some adverse action against a Miller

Woofter denies that she took an adverse action against Miller at all. She claims that Miller did not enjoy the group and that he requested removal, so removing him from the group served his needs and cannot be construed as adverse action. (Doc. 72 at 13.) Woofter cites a grievance filed by Miller about the group, and a conversation she and Miller had. (Doc. 73 at 3 – 4.)

Miller responds that the action was adverse because it delayed him getting mental health treatment. (Doc. 77 at 6.) He had been ordered by parole officials to complete "cognitive based programming," and thus, in his interpretation, he was required to do the group therapy. Miller refers to a letter from a parole official who commented on Woofter's negative clinical notes, which Miller calls false and malicious. (Doc. 77 at 7.) He also denies that he requested to leave the group.

Woofter's Statement of Undisputed Facts includes five of Miller's grievances, only one of which is contemporaneous with Miller's time in the group. (Doc. 73-5 at 2 – 6.) In that one, the day before he was dismissed from the group, he states that he has not received the counseling he has requested, because he has been put in the group at issue. He states, "I have nothing in common with these other prisoners in the group. The main talking points of castration and transgender homosexuality make me uncomfortable. This is not what I was seeking for mental

9

health. I only want to talk to a counselor about some issues. Not participate in a transgender, homosexual, sex offender group." (Doc. 73-5 at 3.)

The subsequent grievances reiterate his disappointment or disagreement with the content of the group, that it wasn't a cognitive behavior therapy group like he had sought, and that he wanted to pursue other counseling. His main complaint is that he has not received further counseling. (Doc. 73-5 at 2, 4, 5 – 6.) (These documents are also attached to Miller's brief.) He does not complain that he is no longer in the group; his complaint is that he does not have other individual counseling to do.

The facts show, based on Miller's own words in his grievances, that he did not want to be in that group, and he did not believe that the group was serving his counseling needs. The fact that there was not other counseling immediately available to him does not make removing him from a group that he did not like and that was not serving his needs an adverse action. Woofter's removal of Miller from the group was not an adverse action in retaliation for Miller's speech.

b.  Because of Miller's protected conduct

The elements of the *Rhodes* test are conjunctive, so Miller's claim falls at the first hurdle. But his failure to establish adverse action is not the claim's only fatal flaw. Miller has also not established that any alleged retaliation was in response to protected speech. There are two elements to

10

this aspect of the claim: the speech was protected, and any action was taken *because of* the protected speech. They are intertwined here. Miller does not establish that the speech that caused his removal was protected, nor that he was removed because of his religious speech.

Not all speech is protected, and the Ninth Circuit has defined the scope of such protections fairly narrowly. *Rhodes* itself dealt with the importance of the First Amendment right to petition for redress of grievances. *See also Brodheim v. Cry*, 584 F.3d 1262, 1269–70 (9th Cir. 2009) (retaliation when a prison official warned a prisoner to be "careful" what he writes and requests in his administrative grievances about prison officials); *Watison v. Carter*, 668 F.3d 1108, 1114–16 (9th Cir. 2012) (retaliation when three correctional officers placed prisoner in administrative segregation, threatened him, and refused to provide him breakfast because of grievances filed against them); *Shepard v. Quillen*, 840 F.3d 686, 693 (9th Cir. 2016) (retaliation when prison officials placed prisoner in administrative segregation because of complaints made against a prison guard); *Entler v. Gregoire*, 872 F.3d 1031, 1041 (9th Cir. 2017) (retaliation when prison officials disciplined prisoner for threatening to sue the prison and its officials and for complaining to the governor about prison conditions).

Subsequent cases have clarified that apparent retaliation for other

11

speech may not give rise to a First Amendment claim at all. *See Quezada v. Herrera*, 2012 WL 1076130, at *4 (E.D. Cal. Mar. 29, 2012) (complaining that inmates had to wear hairnets not protected speech); *Thomas v. MCSO*, 2009 WL 1311992, at *3 (D. Ariz. May 12, 2009) (calling an officer a derogatory name is not protected conduct); *Ruiz v. Cal. Dept. of Corr.*, 2008 WL 1827637, at *2 (C.D. Cal. Apr. 22, 2008) (prisoner's comments expressing dissatisfaction about matters of personal concern to inmate was not a matter of public concern protected by the Free Speech Clause); *Whitfield v. Snyder*, 263 F. App'x 518 (7th Cir. 2008) (prisoner's complaint about prison job involved matters of personal, rather than public, concern and did not qualify as protected speech). In the recent Ninth Circuit case of *Bird v. Dzurenda*, No. 23-2664, 2025 WL 796114, at *3 (9th Cir. Mar. 13, 2025), an inmate's complaints to staff about his cellmate and a demand for a change, which result in negative actions toward him, were not clearly violations of his First Amendment speech, as not grievances against state actors.

Woofter asserts that Miller was removed for disruptive conduct, not religious speech. (Doc. 72 at 14.) Miller asserts he was removed for his religious speech. Miller provides his own declaration and the declarations of two members of the group who primarily dispute the claim that he was disruptive, rather than

make positive assertions that his conduct was religious. Miller relies on these declarations to support his contention that there is a factual dispute. Yet they do not create a factual dispute about the issue that matters—Miller's supposed protected conduct. The two affidavits of the other inmates state that Miller was uncomfortable with the discussions regarding transgender issues and castration, that he did not have a problem with LGBTQ+ individuals, that his discomfort was "in light of his Christian religious beliefs," that he wanted individual therapy, and then repeatedly emphasize that Miller was not disruptive, rude, disrespectful, etc. The emphasis of these declarations is to refute Woofter's position that Miller was disruptive. In fact, Anderson specifically states "After John openly voiced his concerns, [which in the preceding paragraphs had been his discomfort with the transgender and castration talk, and the lack of discussion of the "issues that he was dealing with,]" Woofter became "somewhat hostile" toward Miller. (Doc. 77-1 at 5. *See also* Doc. 77-1 at 2.) These affidavits do not establish that religious speech was the cause of Miller's removal from the group. There is no evidence in these affidavits to establish that Miller was removed for his Christian views, and thus, removed for protected conduct. Without protected conduct, there is no claim for retaliation.

Miller's own declaration elaborates his discussions of his religious beliefs with Woofter. (Doc. 77-2 at 1 – 2.) Before he began the group, he had discussed

13

his Christian beliefs around transgender and homosexual behaviors. He then discusses the three meetings of the group that he attended. He does not mention his Christian beliefs for the first two, though he does express dissatisfaction with the transgender topics. After the second meeting, Miller filed a grievance "to complain about the way Ms. Woofter was conducting the group." (Doc. 77-2 at 3.)

In the third meeting, Miller did not like discussion of another inmate's attempted self-castration, and he asked to talk about his own issues. (Doc. 77-2 at 2.) He then raised his Christianity, and characterizes Woofter's position as "insisting that [Miller] accept the transgender lifestyle." (Doc. 77-2 at 3.) He was asked to leave the meeting. Later that day, he met with Woofter again, and they had a disagreement about theology. Miller told Woofter "that homosexuality was strictly forbidden in scripture and her view was incorrect." (Doc. 77-2 at 3.) Overall, the emphasis of Miller's declaration is on how polite and respectful he was, and how he disagreed with the content of the therapy sessions and the lifestyle of members of the group, based at least in part on his religion.

Woofter's affidavit contradicts these declarations, as she includes references to his disruptive behavior. (Doc. 73-1 at 4.) On the one hand, there is a disputed fact about the extent to which Miller was or was not "disruptive," or interrupting others, or any of the other subjective behaviors that may cause one to be removed from a group. But more importantly, Woofter refers to Miller's open discomfort

with the group. The issue of how disruptive, exactly, Miller may or may not have been need not be resolved, because there is no evidence in the record that Miller was removed for expressing his religious beliefs. He, himself, states that he was uncomfortable. Woofter originally put him in the group having already discussed with him his Christian beliefs. His beliefs were not an obstacle to him joining the group. On the other hand, Woofter could have removed him from the group for the sole reason that his participation "reduced the effectiveness of the group for all participants, including himself." (Doc. 73-1 at 4.) What "disruptive" means is inherently subjective. A polite person can be disruptive by repeatedly asking to change the topic to what he would prefer to discuss.

Miller does not carry his burden to show there is a disputed material fact regarding the role religion played in his removal from the therapy group. Retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two. See *Huskey v. City of San Jose*, 204 F. 3d 893, 899 (9th Cir. 2000). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001). Miller has not shown there are material disputes of fact related to the religious motivation of his removal

15

from group.

          c.  That chilled Miller's exercise of his First Amendment rights

On this element, Miller must allege either a "chilling effect" or that he suffered some other harm. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.2009) (citing *Rhodes*, 408 F.3d at 568 n.11). Woofter disputes that being removed from a group that he did not want to be in would chill his speech, and that, in fact, Miller has discussed the fact that he is a Christian with his new therapist. Miller counters that after his removal from the group, he was afraid to discuss his religion with his new therapist, for fear of retaliation, and thus, his speech has been chilled. (Doc. 77-2 at 3-4.)

A plaintiff does not have to show that "his speech was actually inhibited or suppressed," but rather that the adverse action "would chill *or* silence a person of ordinary firmness from future First Amendment activities." *Rhodes,* 408 F.3d at 568–69 (*quoting Mendocino Enviro. Center v. Mendocino Cty.,* 192 F.3d 1283, 1300 (9th Cir.1999)). This is an objective standard. Miller has successfully shown there is a factual dispute regarding whether his religious speech has been chilled, thus, he defeats summary judgment on this factor of the *Rhodes* test.

          d.  The action did not reasonably advance a legitimate correctional goal.

With respect to *Rhodes'* fifth factor, the Supreme Court has cautioned that "'federal courts ought to afford appropriate deference and flexibility to state

officials trying to manage a volatile environment,' especially with regard to 'the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims.'" *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482–83 (1995)). A plaintiff successfully pleads that the action did not reasonably advance a legitimate correctional goal by alleging, in addition to a retaliatory motive, that the defendant's actions were "arbitrary and capricious" or that they were "unnecessary to the maintenance of order in the institution." *Watison*, 668 F.3d at 1114–15.

A reasonable therapeutic goal is a proxy for a correctional goal here, because successful therapy for inmates is a legitimate correctional goal. *Wicklund v. Idaho Dep't of Corr.*, No. 1:09-CV-00674-EJL, 2012 WL 913761 (D. Idaho Mar. 16, 2012), *aff'd*, 623 F. App'x 338 (9th Cir. 2015.) It is not the province of the courts to wade into how a licensed clinical social worker chooses to administer a therapy group. Presumably, there would be bright lines that the Court would be competent to adjudicate—express discriminatory behavior, blatant abuse, etc.—but there is no proof of the existence of such bright lines in this case.

Miller posits that "Woofter's insistence of only allowing graphic transgender discussions in her group while denying miller to speak did not advance any legitimate correctional goal." (Doc. 77 at 5.) Miller again relies on the position that he could not have been disruptive enough to be removed from group, and

therefore, it must have been his religion. But that asks too much of the requirement of legitimacy. If Woofter, as a medical professional, concluded that Miller was not benefiting from the group or benefiting the group, she had the legitimate authority to remove him from it.

### e. The "Reports"

The parties refer to Woofter's notes in Miller's medical care file as "reports." Miller alleges that the reports are full of lies, and thus, further retaliation for expressing his religious views. This claim fails for additional independent reasons from the failure of the group removal claim.

Woofter asserts qualified immunity on Miller's claims. (Doc. 72 at 29–31.) But based on the conclusion above that Miller's constitutional rights were not violated regarding his removal from the group, qualified immunity is not reached. However, Miller's argument that Woofter violated his constitutional rights because she made negative comments about him in her treatment notes, that were then available to parole board staff, presents a novel situation that entitles her to qualified immunity.

In the notes appended to Miller's Amended Complaint, Woofter says the following, among several other observations: Miller "went off track," "degrade[d] his group members," interrupted, was unwilling to follow group rules, "directly attacked his peer's feedback," "ignored requests" to follow group rules,

"demonstrated as angry and bullied his group cohorts," and "demonstrated a total lack of regard for others around him." (Doc. 13-1 at 3–4.) In the notes, Miller's Christianity is discussed, but only in terms of what Miller said it meant to him, and in a suggestion by Woofter that he speak with church members for support. There is no connection found in these notes between Christianity and Miller's behavior or that religion motivated Miller's behavior. Thus, Miller asks the Court to find Woofter legally liable for the content of her practice notes, because he believes he did not engage in any of the subjective conduct described by Woofter in those notes.

> "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."

*Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (internal citations and quotations omitted.)

Under *Rhodes*, Miller's First Amendment argument is that Woofter wrote negative comments in her notes to retaliate against him for expressing his Christian views. Thus, the content of the notes is the alleged adverse action in the First Amendment context. On the merits, as discussed briefly below, the claim fails. But

on this claim, Woofter's qualified immunity is readily apparent. There are no Ninth

Circuit Court of Appeals or U.S. Supreme Court cases holding that a prison

psychologist is subject to liability on a First Amendment claim related to the

content of her case notes. The closest proxy may be so-called chronos, notes taken

by prison staff, including counselors, to document various events in the lives of

prisoners. District courts in the Ninth Circuit that have considered these chronos in

a First Amendment context have concluded that they do not constitute adverse

actions within the meaning of the *Rhodes* test. *See, e.g., Samano v. Copeland*, 2008

WL 2168884, at *2 (E.D. Cal. May 23, 2008) (dismissing retaliation claim because

counseling chrono did not constitute adverse action), *report and recommendation*

*adopted*, 2008 WL 2858217 (E.D. Cal. July 24, 2008); *Williams v. Woddford*, 2009

WL 3823916, at *3 (E.D. Cal. Nov. 13, 2009) (dismissing retaliation claim

because alleged filing of the false informational chrono was not adverse action);

*Jenkins v. Caplan*, 2010 WL 3742659, at *2 (N.D. Cal. Sept. 16, 2010) (granting

summary judgment for defendant where plaintiff failed to present evidence that

chrono constituted adverse action); *Martin v. Desha*, 2017 WL 1354140, at *2

(E.D. Cal. Apr. 13, 2017) (dismissing retaliation claim on ground that

informational chrono did not constitute adverse action, even though plaintiff

alleged that it might be used to deny parole; reasoning that multiple factors play

into parole decision); *Heilman v. Furster*, 2018 WL 2588900, at *10–11 (C.D. Cal.

20

May 1, 2018) (finding false chronos are not adverse actions); *Vallery v. Botkin*, No. 220CV0767TLNKJNP, 2020 WL 7425343, at *4 (E.D. Cal. Dec. 18, 2020), *report and recommendation adopted,* No. 220CV00767TLNKJN, 2021 WL 843614 (E.D. Cal. Mar. 5, 2021).

These district courts are not binding precedent here. Their analysis, in the absence of other binding precedent on the issue, reflects that Woofter would not have been aware that writing negative subjective comments in a treatment note, even if false, would make her subject to a First Amendment claim. Woofter is entitled to qualified immunity on a claim arising out of her treatment notes.

(The claim fails under the *Rhodes* test in any event, in part because it is illogical. Writing notes in a file that a prisoner does not have access to except under unusual circumstances cannot be construed as an adverse retaliatory action that is intended to chill his speech. Woofter's notes are written to aid herself and others in the psychological treatment of Miller. It stretches credulity to posit that she wrote these allegedly false notes in the hopes that someday Miller might have access to them and then have his speech chilled.)

### 3. Religious Freedom

Miller claims that Woofter violated his First Amendment right to religious freedom. (Doc. 13 at 6.) The basis of this claim is that during the group sessions, Woofter tried to "coerce" him into accepting beliefs that contradicted his religion.

*Id.* Woofter moves for summary judgment, claiming that her actions did not affect his ability to practice his religion. (Doc. 72 at 19 – 22.) Miller did not respond to this aspect of Woofter's motion.

The parameters of Miller's claim do not fit easily into the legal framework of a typical First Amendment freedom of religion claim. That is, he contends that his rights were violated for, essentially, isolated incidents of expression. He said in group therapy that certain behaviors of other members of the group were against his religion. For that reason, his claims are much more readily assessed in the retaliation context discussed above.

To prevail on a First Amendment religious freedom case, a prisoner must establish that prison officials substantially burdened the religious practice by preventing him from engaging in conduct which the prisoner sincerely believes is consistent with his faith. *Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). A regulation that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to prisoners; (3) the impact accommodation of the right will have on guards and other prisoners, and on the allocation of prison

resources; and (4) the absence of ready alternatives. *Id.* at 90. To apply this test to Miller's claim is to view Woofter's decision to remove him from the group as a policy.

The first *Turner* factor is the most important. *Jones v. Slade*, 23 F.4th 1124, 1135 (9thCir. 2022). To evaluate whether a valid, rational connection exists, the Court must determine "'whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective." *Id*. (*quoting Mauro v. Arpaio*, 188 F. 3d 1054, 1058 (9th Cir. 1999) (en banc)). The challenged policy "cannot be sustained where the logical connection between the regulation and the asserted goal is so removed as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89.

The Court "must apply a deferential standard of review to challenges regarding prison regulations." *Mauro*, 188 F. 3d at 1058. "Prison officials need merely put forward a legitimate government interest and provide some evidence that the interest put forward is the actual reason for the regulation. *Casey v. Lewis*, 4 F.3d 1516 1520–21 (9th Cir. 1993) (internal citations omitted).

Analysis of this factor is similar to that above; regardless of whether Woofter's removal of Miller from the group followed a day in which he particularly stated his religious beliefs, he was not benefiting from the group, and he vocally disapproved of the lives of other members of the group; Woofter had a

legitimate reason to remove him from the group.

The relevant inquiry under the second *Turner* factor is "not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected," but rather, "whether the inmates have been denied of all means of religious expression." *Ward v. Walsh*, 1 F. 3d 873, 877 (9th Cir. 1993). Thus, curtailing "various ways of expressing belief, for which alternative ways of expressing belief may be found," does not implicate the First Amendment. *Id*. In the instant case, Miller has alleged no restriction on his ability to discuss his religion in any other context, and, in fact, is taking theology classes and otherwise engaging in his religious practice. (Doc. 73-6 at 9.) He has not been denied of all means of religious expression.

The third factor asks what kind of effect a religious accommodation will have on prison guards and other inmates. This factor is particularly difficult to apply because it assumes that Miller's comments were a religious practice, and not a justification for comments about other inmates. That is, Miller's religious beliefs may motivate his comments, because for him they are religiously true. But a comment that disapproves of another member of a group's lifestyle is also just that, a comment that may not have therapeutical value in a group therapy setting. Thus, an accommodation of someone's religious position is different from an accommodation of someone's critical (or worse) commentary in a therapeutic

24

setting.

Similarly, the final *Turner* factor also cuts in Woofter's favor. The Supreme Court has reaffirmed the premise that even when claims are made under the First Amendment, courts should refrain from "substituting our judgment on … difficult and sensitive matters of institutional administrations, for the determinations of those charged with the formidable task of running a prison." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987) (internal citations omitted). The principle applies double when it is not only a penological context, but also a therapeutic one. Woofter is entitled to summary judgment.

### 4. Fourteenth Amendment equal protection rights

Miller's Complaint alleges that Woofter discriminated against him for being a member of a protected class based on religion by preferring members of another protected class, the "transgender/homosexual community." (Doc. 13 at 7.) Woofter asserts Miller's Fourteenth Amendment claim fails because he has not identified a similarly situated group who was treated more favorably than he was. Miller identifies the groups as his Orthodox Christian religious identity, versus the transgender identities of group members. Miller also claims to rely on the so-called "class of one" type equal protection claim. (Doc. 77 at 11.) But that approach is not available in this context and was dismissed in the Court's original screening order. (Doc. 4 at 14–17.)

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person the equal protection of the laws, with the general objective "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A viable equal protection claim under § 1983 requires a prisoner to show that the defendant acted with an intent or purpose to discriminate against the prisoner based on membership in a protected class. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (citing *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)). The "intent" component of a discrimination claim requires the prisoner to demonstrate that "the defendant acted at least in part because of [the prisoner]'s protected status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).

Miller's assertion is that he was discriminated against for his Orthodox Christian views. The Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (providing that Buddhist prisoners must be given opportunity to pursue faith comparable to that given Christian prisoners).

Based on the analysis and lack of evidence discussed above, Miller has not shown there is a material disputed fact as to whether he was treated unfairly due to his religion. Woofter is entitled to summary judgment on Miller's equal protection

claim.

      5. Mont. Code Ann. § 27-33-105

Because Miller has failed to prevail on any federal law claim, the Court

declines to exercise its jurisdiction over Miller's state law claim. 28 U.S.C. §

1367(c)(3); *see also Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir.

1997) ("The Supreme Court has stated, and we have often repeated, that 'in the

usual case in which all federal law claims are eliminated before trial, the balance of

factors . . . will point towards declining to exercise jurisdiction over the remaining

state-law claims'." (citation omitted)).

## III. CONCLUSION

    Plaintiff Miller has not shown there are material facts in dispute. Defendant

Woofter is entitled to summary judgment.

      Accordingly, it is HEREBY ORDERED:

      1.  Defendant Woofter's motion for summary judgment is GRANTED.

(Doc. 71.)

      2. The Clerk of Court is directed to enter judgment pursuant to Fed. R. Civ.

P. 58.

      DATED this 8th day of April, 2025.

                              _____

                              Donald W. Molloy, District Judge
                              United States District Court